# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 16, 2013 Session

## SAMUEL RYAN HAWKINS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Putnam County**
**No. 06-0463     David A. Patterson, Judge**

---

**No. M2012-02293-CCA-R3-PC - Filed November 26, 2013**

---

The Petitioner, Samuel Ryan Hawkins, appeals from the denial of his petition for post-conviction relief attacking his conviction for aggravated child abuse. On appeal, the Petitioner contends that the post-conviction court erred in denying relief because trial counsel rendered ineffective assistance of counsel by failing to obtain an expert witness to rebut the State's theory of shaken baby syndrome. Following our review, we affirm the denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

G. Jeff Cherry, Lebanon, Tennessee, for the appellant, Samuel Ryan Hawkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Randall A. York, District Attorney General; and Beth Willis and Anthony Craighead, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The facts underlying the Petitioner's conviction for aggravated child abuse, as recited by this court on direct appeal, are as follows:

Myra Overall operates a daycare in Cookeville. At the time of trial, she had operated the daycare for twelve years. Her daycare is licensed by the

Department of Human Services ("DHS"). The victim, L.E.,[1] was a child at her daycare. As part of her licensure through the Department of Human Services, Ms. Overall makes notes if there are any injuries out of the ordinary to keep in the children's files. Ms. Overall began caring for L.E. when she was two months old. She also cared for L.E.'s older sibling.

On May 3, 2006, while L.E. was at Ms. Overall's daycare, she was hit by a toy thrown by another child at the daycare. L.E. had a red mark on her cheek, but she did not vomit, become lethargic, become pale or abnormally cry following the incident. Ms. Overall did make a notation of the incident in a file she kept for L.E. On May 12, while L.E. was at the daycare, Ms. Overall called the victim's mother to come and get her. Ms. Overall was concerned because L.E. was not breathing right, was strangely crying, was vomiting, and felt cool to the touch. L.E.'s mother picked L.E. up from the daycare. She later told Ms. Overall that she had taken L.E. to the doctor, and L.E. had a virus.

On May 18, the victim's mother dropped L.E. off at the daycare with instructions that L.E. needed a few more ounces of formula. After having a little over an ounce, L.E. vomited. Ms. Overall checked L.E. L.E. was breathing with a raspy sound and would take three or four shallow breaths in a row and then gasp. Ms. Overall called the victim's mother to come get L.E. to take her to the doctor. While waiting for L.E.'s mother, L.E. became pale and felt "like her temperature was cooling off." When L.E.'s mother arrived it was before 9:00 a.m. She told Ms Overall that L.E. had a doctor's appointment at 1:30 p.m. Because Ms. Overall was so alarmed by the victim's symptoms, she told the victim's mother that an appointment at 1:30 p.m. was too late. She urged the victim's mother to take L.E. to the doctor immediately.

Dr. Christopher Climaco is a pediatrician in Cookeville, Tennessee. He is L.E.'s pediatrician. On May 12, 2006, the nurse practitioner at Dr. Climaco's practice treated L.E. for vomiting. She was diagnosed as having acute gastroenteritis. On May 18, 2006, Dr. Climaco saw L.E. at his practice. She was lethargic and not interacting well. She did not have a fever. Dr. Climaco was unsure if L.E. was having seizures, but he did note that L.E.'s eyes were rolling back into her head. She was also vomiting. Dr. Climaco was very concerned and admitted L.E. into the hospital at Cookeville. He recommended an MRI. After consulting with a doctor at Vanderbilt Hospital, Dr. Climaco had L.E. transferred to Vanderbilt Hospital. Dr. Climaco believed

---

[1] It is the policy of this court to refer to minor victims by their initials.

that L.E. had more than common gastroenteritis. Although he did not contemplate "shaken baby syndrome" at the time, at trial he stated that shaken baby syndrome could have been a possibility. Dr. Climaco was still L.E.'s pediatrician at the time of trial. At trial, L.E. would have been almost two. He testified that L.E. does not act like an average two year old. She does not walk, crawl, or talk. In Dr. Climaco's opinion, L.E. is neurologically impaired. Her speech, motor skills, and vision are all impaired. She can eat, but she cannot feed herself.

Dr. Paulette Johnson is a Pediatric Critical Care Specialist at Vanderbilt Children's Hospital. When an injured child comes into the Critical Care Unit, Dr. Johnson is the presiding doctor over the team of physicians that treat a child in the unit. She was the team leader when L.E. arrived at Vanderbilt on May 18, 2006. Upon her arrival, the doctors deemed L.E. critically ill. They discovered that L.E. had two subdural hematomas. A subdural hematoma is bleeding that occurs below the top layer of the covering of the brain. It is life-threatening if left untreated. After ruling out other medical possibilities, the doctors concluded that L.E.'s diagnosis was non-accidental trauma.

Non-accidental trauma is an injury that is not a typical childhood injury occurring from normal activity. One fact that led to this conclusion is that L.E. was three months old, and a three-month-old child is not mobile. They further concluded that it was most likely a shaking injury because there were no marks or lacerations on L.E.'s scalp to show that her head had been hit by an object. When a shaking injury occurs, the force of the shaking causes the brain to move back and forth within the skull. The motion is known as acceleration/deceleration motion. When the force is enough to cause such a movement, the blood vessels tear and cause a hematoma. The shaking that would cause such an injury is equivalent to what would occur in an automobile accident.

Dr. Johnson analyzed the CT scan taken at the hospital at Cookeville and the CT scan taken at Vanderbilt. A comparison of the two scans showed that the hematoma was expanding. This means that the hematoma was continuing to bleed. The bleed was considered an "acute bleed" which means that the bleeding began within the day or so before the examination. L.E. also had a fracture to one of her tibias and had retinal hemorrhages.

Dr. Sean Donahue is a Professor of Ophthalmology and Visual Sciences at Vanderbilt Hospital. Part of his practice focuses on pediatric

ophthalmology. He is part of the child abuse team. Dr. Donahue treated the victim when she was brought to Vanderbilt Hospital. When Dr. Donahue examined photographs of L.E.'s retinas, he found extensive hemorrhaging. He testified that the most common cause of retinal hemorrhaging for L.E.'s age is abuse, more specifically, shaken baby syndrome. It is possible to have hemorrhaging from certain diseases but not to the same extent as present with L.E. When a child is otherwise healthy, the main cause of retinal hemorrhaging is non-accidental trauma. L.E. was evaluated for other causes of the retinal hemorrhaging, and other medical causes were ruled out.

Dr. Donahue testified that the medical community is unsure exactly when during a shaking episode the hemorrhaging occurs. There is debate as to whether it is the actual shaking or if it is the brain's impact within the victim's skull as a result of the shaking that causes the injury. This injury occurs in children under a couple of years old because they lack head control. Dr. Donahue also ruled out any possibility that the hemorrhaging could have occurred during a vaginal birth.

L.E.'s optic nerve was also injured as a result of the episode that caused the retinal hemorrhaging. Following an injury to the optic nerve, it becomes paler over the course of a few weeks. Dr. Donahue testified that the damage occurred before he saw L.E. and that the victim's optic nerve was paler in each subsequent examination. As a result of these injuries, L.E. is permanently and severely visually impaired.

When asked if the presence of a subdural hematoma and a distal tibial fracture suggested anything, Dr. Donahue stated that it would increase his suspicion that there had been a non-accidental trauma. When asked if a care giver's confession of shaking the child would be consistent with the eye injuries, Dr. Donahue replied that it would be. Dr. Donahue also stated that there is no question in his mind that L.E. was shaken.

On cross-examination, Dr. Donahue stated that there have been cases where retinal hemorrhages have been caused by accidental trauma. However, the hemorrhages caused by accidental trauma are different from those caused by shaken baby syndrome. Dr. Donahue then agreed that it is more likely than not that L.E.'s injuries were caused by non-accidental trauma. He stated that he was "very close to certain" that the injuries were caused by non-accidental trauma. Dr. Donahue stated that when the injuries seem suspicious the child abuse team looks at the injuries from the different sub-specialties to determine

the nature of a victim's injuries and whether the child is at risk for further abuse. He stated that he looks at the notes and charts of other members on the team as well as other doctors who are treating the patient. Dr. Donahue stated that he concluded that the retinal hemorrhaging was caused by non-accidental trauma when he viewed pictures of L.E.'s retinas and examined them himself. The extent of the hemorrhaging stood on its own to support his diagnosis. The notes and charts of the other doctors treating the victim were consistent with his diagnosis and provided additional support.

Dr. Deron Sharpe was a pediatric neurology resident at Vanderbilt Hospital when the victim was brought in for examination. When he examined her in the intensive care unit she was expressing severe encephalopathy. Encephalopathy refers to the cognitive and motor properties of the brain. L.E.'s alertness was severely subdued. Dr. Sharpe testified that he recalled that the victim did not respond to anything from sight during his neurological testing. Dr. Sharpe also referred to notes taken by other doctors treating the victim. Dr. Sharpe noticed that L.E. had severe retinal hemorrhaging and that she had something wrong with her brain. CT scans showed that L.E. had a superficial hemorrhage on top of her brain, as well as, swelling within her brain in a multitude of areas. He determined that L.E. had a severe brain injury. He also opined that the image taken at the time did not "portray the severity" that the examination did. Dr. Sharpe testified that there was dead or dying brain tissue at the time of the examination. The type of force that could cause such an injury would be very violent and would be on the level of a car accident or falling from a three story building. Falling off of a couch, bed, or out of a crib would not cause this type of injury and neither would getting hit in the face with a plastic toy. Such an injury would be apparent within forty-eight hours. Dr. Sharpe examined L.E. the day before trial. He stated that she is severely, neurologically injured. She is not able to walk or feed herself. She cannot speak more than one word.

On cross-examination, Dr. Sharpe stated that a subdural hematoma can cause vomiting and lethargy. He also stated that it is possible that L.E. had a pre-existing hematoma before the one he saw during his examination. If there was a pre-existing hematoma, a new injury could cause it to rebleed. Dr. Sharpe reemphasized that the subdural hematoma he saw upon his examination was acute. Based upon the blood that was showing up, Dr. Sharpe estimated that the injury had to have occurred within twenty-four to forty-eight hours to her being admitted to the hospital.

Following L.E.'s examination and admittance to the hospital. Ms. Overall was visited by DHS. She was informed that she had to close the daycare until the investigation was completed. The daycare was closed for two days and then reopened.

Detective Greg Cooper was a criminal investigator with the Putnam County Sheriff's Department at the time of the incident. He was the lead investigator of the case at hand. He received a call from Vanderbilt Hospital on the afternoon of May 18, 2006, regarding L.E. On May 22, 2006, Detective Cooper interviewed Ms. Overall who was fully cooperative. Ms. Overall related an incident from May 3, 2006, when a child at the daycare threw a toy, and it hit L.E. in the face. On May 12, 2006, Ms. Overall called the victim's mother to come pick up L.E. because she vomited while at the daycare. On May 23, 2006, Detective Cooper and Jennifer Fisher with the Department of Children's Services ("DCS") interviewed [the Petitioner] and his girlfriend, the victim's mother, in connection with the victim's injuries. The purpose of the interview was to see if [the Petitioner] or the victim's mother knew what had happened. Detective Cooper spoke with them separately. [The Petitioner] and the victim's mother were not under arrest at the time, and Detective Cooper did not give them their <u>Miranda</u> warnings. At the time of this interview, Detective Cooper had been told that the victim had a serious head injury and possible brain damage. At the interview, [the Petitioner] seemed detached. He was not crying; he was not angry. [The Petitioner] gave no explanation whatsoever as to how the injuries could have occurred. When the interview concluded, [the Petitioner] was free to leave. Detective Cooper also interviewed the victim's mother.

Jennifer Fisher with DCS also testified at trial. She investigates allegations of child abuse and neglect. L.E.'s case was referred to Ms. Fisher on May 19. She went to Vanderbilt Hospital to see the victim. She spoke with [the Petitioner] at the hospital. He made no explanation as to how L.E. sustained her injuries. Ms. Fisher also went to the home that [the Petitioner] and the victim's mother shared. When she interviewed [the Petitioner] on May 23, she informed him that if the cause of the injury could not be determined, the children would have to come into State custody. [The Petitioner] still offered no explanation for the injury. Ms. Fisher also informed the victim's mother that the children would come into State custody if the cause of the injury was not determined.

Detective Cooper was not satisfied with his interviews of [the Petitioner] and the victim's mother. He arranged a "technical interview" on May 24. This interview was held in the Tennessee Bureau of Investigation ("TBI") office in Cookeville. [The Petitioner] and the victim's mother came in their own car. Detective Cooper stayed in the building while Special Agent Skip Elrod, an agent with the TBI, interviewed [the Petitioner] in a separate room.

Agent Elrod conducted the technical interview of [the Petitioner]. Agent Elrod gave [the Petitioner] his Miranda warnings. [The Petitioner] signed a waiver of his Miranda rights. At the end of the interview, Agent Elrod told [the Petitioner] that he did not believe [the Petitioner's] story and believed that [the Petitioner] was involved with the victim's injuries. [The Petitioner] became remorseful and upset. [The Petitioner] told Agent Elrod that he had lost his temper and shaken the baby in the swing.

Agent Elrod came out of the room and told Detective Cooper that [the Petitioner] wanted to speak with him. When Detective Cooper entered the room, [the Petitioner] was crying and "seemed to be in pretty bad shape." Detective Cooper walked [the Petitioner] to another room and read him his Miranda rights. Detective Cooper took a statement from [the Petitioner] where Detective Cooper transcribed what [the Petitioner] told him. Detective Cooper would write down what he heard, and he would read it back to [the Petitioner]. In his statement, [the Petitioner] said L.E. was in the baby swing and vomited on herself. [The Petitioner] called the victim's mother for help, but she did not answer. A few minutes later, the victim's mother asked what he needed. He said he needed help. The victim's mother screamed at him, and he threw the baby car seat against the wall. He was still angry, and L.E. was crying in the swing. [The Petitioner] stated, "I grabbed the swing and shook it with [L.E.] in it and yelled stop crying. I realize that I shook her too hard." At the conclusion, [the Petitioner] signed and dated the statement.

State v. Samuel Ryan Hawkins, No. M2008-01611-CCA-R3-CD, 2009 WL 2448296, at *1-5 (Tenn. Crim. App. Aug. 11, 2009) (footnote in original), perm. app. denied, (Tenn. Jan. 25, 2010). The Petitioner was subsequently sentenced to serve eighteen years at one hundred percent incarceration. This court affirmed the sufficiency of the evidence on direct appeal, and the Petitioner's application for permission to appeal was denied by our supreme court. See id.

Thereafter, on December 21, 2010, the Petitioner, with the assistance of counsel, filed a petition for post-conviction relief, alleging numerous grounds of ineffective assistance of counsel therein. Although the petition for relief raised multiple grounds of ineffective assistance, many of those allegations were abandoned at the evidentiary hearing. On appeal, the Petitioner's brief is limited to a single allegation: that trial counsel failed to retain a medical expert to contradict the State's proof that the victim's injuries were caused by shaken baby syndrome. Because the Petitioner has abandoned all other claims on appeal, we will limit our recount to the facts relevant to the single issue of ineffective assistance presented.

An evidentiary hearing was held on May 23, 2012, and the following proof was adduced. The Petitioner was represented at his December 2007 trial by Hilton Conger ("co-counsel") and Kevin Latta ("lead counsel"). Co-counsel was first to testify at the hearing and stated that he had been licensed to practice in this State since 1972 and that about half of his practice was devoted to criminal cases. In September 2006, co-counsel's firm was hired by the Petitioner to defend the Petitioner against the aggravated child abuse charge and to represent him in the resulting DCS matter; at that time, lead counsel was a new associate in the firm. According to co-counsel, both attorneys were "handling the case"; he "didn't view it as one handling it exclusively from the other." However, co-counsel agreed that his new associate eventually "took the lead in the case." Co-counsel asserted that decisions made on behalf of the Petitioner were "joint decision[s]" by him and lead counsel and that they met with the Petitioner frequently.

During the course of the DCS proceedings, depositions were taken of four medical experts, and testimony from these doctors established that the injuries sustained by the victim were the result of shaken baby syndrome. According to co-counsel, he was "involved" in the case during these depositions, and lead counsel "spearheaded" the efforts to secure a rebuttal medical expert. Ultimately, the firm hired an outside company to help in the search for an expert.

Co-counsel testified that the "first line of defense" in the criminal case was to seek suppression of the Petitioner's statement, wherein the Petitioner admitted to shaking the victim in her swing. Failing that, "the defense was that the injuries to [the victim] did not come at [the Petitioner's] hand"; i.e., that it was "[n]ot an intentional act on [the Petitioner's] part." Following the denial of the Petitioner's motion to suppress his statement, counsel sought and received a continuance in order to find a medical expert who would provide favorable testimony for the Petitioner. Co-counsel stated that they were ultimately unsuccessful in securing an expert who could rebut the State's medical evidence; he did not recall funds being an issue. When asked how they were "going to handle the [S]tate's four experts," co-counsel remembered that one of the doctors had done "a very poor job in his deposition in the DCS case[,]" and they believed his demeanor would probably be the same

at trial. Therefore, they thought a "rigorous cross examination" of that doctor would be effective at trial; however, that doctor "made a great live witness[.]" Co-counsel stated that both he and lead counsel had "done a tremendous amount of research" on shaken baby syndrome and "that there was this body of research out there that brought into question the shaken baby theory." Accordingly, their strategy was, through cross-examination, to get "the doctor" to admit to this body of research, thus indicating that the injury to the victim was not "necessarily" caused by shaking and offering a "plausible or another explanation for the injuries to the child."

Lead counsel testified that received his law license in October 2005 and promptly joined co-counsel's firm. At that time, the majority of his practice was devoted to criminal work. He stated that he had conducted approximately ten jury trials prior to the Defendant's motion to suppress hearing in August 2007 and had a very good success rate.

Relative to the Petitioner's case, lead counsel attempted to secure the assistance of a medical expert favorable to the Petitioner and received an additional $1,500 from the Petitioner to hire outside help in the search. Lead counsel sent approximately twelve letters to prospective medical doctors, including Doctor Edward Willey, and he received approximately six responses from those doctors, including a response from Dr. Willey. Lead counsel could not remember exactly which of those doctors from whom he received responses that he actually spoke to, but ultimately, he focused his efforts on Doctor Janice Ophoven because she was located within the state and was recommend by another criminal defense attorney.

After the trial court denied the motion to suppress, lead counsel "informed the court that [a continuance] was necessary in order to provide a constitutional defense . . . because the medical expert had not at that point been obtained," and a continuance was granted. Lead counsel recalled having a conversation with the Petitioner "about needing more money to employ an expert," and "there was a time when there was some conversation about maybe [the Petitioner's] dad could come through with some money[.]" Lead counsel described the sought expert testimony as expensive, including paying for both the expert's travel and hotel expenses. According to lead counsel, "it was getting into looking like it was going to be five figures." Ultimately, lead counsel filed an ex parte motion for expert services, seeking funding based upon the Petitioner's indigency. In the motion for expert services, lead counsel stated that a medical expert was "absolutely necessary" in preparation of the defense. The court approved this request, but according to lead counsel, they "ran into some snags" with the Administrative Office of the Courts (AOC) and "just could never get [the money] lined up" to pay Dr. Ophoven. Lead counsel did not seek any further continuances; therefore, they proceeded to trial without an expert.

Dr. Edward Willey, who received his medical degree in 1958 from the University of Michigan and was a practicing physician in St. Petersburg, Florida, testified as an expert in anatomical pathology. Dr. Willey stated that he reviewed the victim's medical records and the testimony of the State's four pediatric medical experts in this case, and he opined that the victim's injuries were not caused by shaken baby syndrome and provided a detailed reasoning for that opinion. He acknowledged that he did not utilize the Petitioner's confession in rendering this opinion and that he could not "explain what happened' to the victim, terming it as "a naturally occurring process which may very well involve sinus and veinous thrombosis with dehydration." Dr. Willey referred to shaken baby syndrome as a "myth," although acknowledging that it was a widely-accepted medical diagnosis. Dr. Willey confirmed that he did not see patients and that he had not done any autopsies in the past five years, accordingly, acknowledging that his opinion was based upon a review of the medical records and the study of literature.

Dr. Willey agreed that lead counsel in this case sent him a letter seeking assistance and that he responded to that letter, stating that he was available to testify in the Petitioner's case. Dr. Willey stated that he had testified in Tennessee before as a defense expert, having "substantial experience" with the AOC. He noted that the AOC often declined to pay without explanation. Dr. Willey also detailed his expenses and stated that he sometimes accommodated his clients by accepting payment after his services had been rendered. According to Dr. Willey, his expenses were "largely prepaid," and the fee for his testimony in this case was approximately $3,500. Dr. Willey stated that he had reviewed the medical experts' trial testimony, and he agreed that lead counsel cross-examined one of the State's doctors about other possible causes for the victim's injuries besides shaking. Dr. Willey testified, "[T]here's no question in the process of [Dr. Donahue's trial] testimony he indicated there were other methods of causing retinal hemorrhages, including delivery at birth."

The Petitioner's mother testified. She stated that she provided her son with the money to hire co-counsel's firm and that she provided the additional $1,500 requested by the Petitioner's attorneys for obtaining a medical expert. According to the Petitioner's mother, neither the Petitioner nor his attorney ever asked for any additional funds; she did not testify as to whether she would have been able to provide those funds if so requested.

The Petitioner testified that he borrowed money from his parents to hire his lawyers and that he borrowed an additional $1,500 to provide funds for a medical expert. Afterwards, lead counsel discovered that the State may pay for an expert, even though counsel was retained, if the Petitioner was considered indigent. The Petitioner said that he did not make a lot of money and had child support payments, so he believed himself to be indigent and therefore filled out the indigency form. However, according to the Petitioner, counsel never

informed him that they were unable to secure funding and needed more money to pay for a medical expert. The Petitioner testified that he could have borrowed more money from his mother for a medical expert, had a request for such funds ever been made.

By order filed on August 29, 2012, the post-conviction court denied the Petitioner relief. The post-conviction order provides as follows:

> The court finds that Dr. Edward Willey could have been available for trial and that the testimony of Willey would have been as received during the post-conviction hearing. The testimony of Dr. Willey would have contradicted the testimony of the [S]tate's expert witnesses. The court further finds that funds may have been available through the Petitioner's request to the AOC or may have been available from a loan made by the Petitioner's mother.

> It is not shown that had Dr. Willey testified at trial the outcome would have been different. The [S]tate's experts in the fields of pediatric critical care, pediatric ophthalmology, and pediatric neurology concluded that the injuries suffered by the victim were caused by non-accidental shaking. These doctors observed and examined the victim shortly after the subject incident. The Petitioner confessed. Willey's testimony does not overcome the strong proof presented by the [S]tate. The Petitioner has not demonstrated that, had his trial attorney's presented Willey's testimony at trial, the verdict of the jury would have been different.

> The court finds that neither the testimony of the witnesses nor the exhibits introduced by the Petitioner demonstrates a deficient performance on the part of the Petitioner's trial attorney. Further, the court finds that the proof presented by the Petitioner does not cause this court reason to question the jury's finding of guilt beyond a reasonable doubt. Finally, the court finds that the Petitioner has not shown by clear and convincing evidence that he deserves relief from conviction and a new trial.

The Petitioner filed a timely notice of appeal.

## ANALYSIS

On appeal to this court, the Petitioner contends that trial counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions at trial. He has argued only a single ground of ineffective assistance, providing as follows:

[Lead Counsel] knew he needed a medical expert to assist in case preparation and provide testimony to support his defense theory. Two willing experts [who] would have offered substantial assistance and competing expert testimony were identified. Funds with which to retain an expert were available. However, no expert was retained. Without expert assistance, [the Petitioner's] defense was unsupported, incomplete and weak.

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a

showing that counsel's performance was deficient is not enough; rather, the petitioner must also show that but for counsel's deficient performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The Petitioner argues that the failure of counsel to present expert evidence that the victim's injuries were caused by some means other than shaking constituted ineffective assistance of counsel. At the post-conviction hearing, lead counsel testified that his attempt to procure his desired expert was stymied by the AOC. It was not clear from the testimony at the hearing why and how the AOC hampered the defense's efforts in this regard. Dr. Willey responded to lead counsel's letter and would have been available to assist in the Petitioner's defense. The post-conviction court also determined that expert funding may have been available via the Petitioner's mother. Although stating in the motion for funding that procurement of an expert was critical to preparation of the Petitioner's defense, the Petitioner's lawyers chose to proceed to trial, without attempting to seek any further

continuances, and tried to present the defense through cross-examination of the State's medical experts. See State v. Marie Delaluz Urbano-Uriostegui, No. M2012-00235-CCA-R3-CD, 2013 WL 1896931, at *17 (Tenn. Crim. App. May 6, 2013) (finding that trial counsel made a reasonable effort to find an expert, although one was not called at trial, and made a tactical choice to present the defense theories through cross-examination and medical literature, and therefore, petitioner had not established deficient performance), perm. app. denied, (Tenn. Oct. 16, 2013). However, even if counsels' failure in this regard to further seek expert assistance on the Petitioner's behalf was deficient performance, the Petitioner must still establish prejudice.

While Dr. Willey's testimony certainly would have aided the Petitioner in his defense, such is not the test. Again, the prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. On direct appeal, this court concluded that the evidence presented at trial was "amply sufficient" to support the Petitioner's conviction, noting the following:

> [The Petitioner] stated that he shook L.E. The day after the shaking occurred, Ms. Overall noticed that L.E. was having trouble breathing. L.E. was taken to the hospital in Cookeville and subsequently, admitted to Vanderbilt Hospital. Both Dr. Johnson and Dr. Donahue, who treated L.E. at Vanderbilt, testified that L.E.'s injuries were the result of non-accidental trauma. Each doctor stated that shaking was the likely cause of the injuries. Dr. Sharpe testified that a baby falling out of a crib or off of a couch or bed, or being hit with a plastic toy would not cause an injury to the extent present in L.E. He further stated that such an injury could be caused by force equivalent to falling from a three story building or being in a car accident. Dr. Johnson also testified that there was no evidence of any lacerations or marks to L.E.'s skull to show such an accident.

Hawkins, 2009 WL 2448296, at *6. The post-conviction court noted many of the same facts in its order denying relief. Furthermore, Dr. Willey recognized that his view that shaken baby syndrome was a "myth," was a minority view, and contrary to the widely-accepted medical diagnosis. It appears from testimony at the post-conviction hearing that counsel were well-educated on the subject of shaken baby syndrome and able to contradict some of the medical proof through cross-examination at trial. Dr. Willey agreed that lead counsel cross-examined one of the State's doctors about other possible causes for the victim's injuries besides shaking, including occurring during birth. Based on our review of the record on appeal, we agree that the Petitioner failed to demonstrate that he was prejudiced by

-14-

counsels' performance.  See Russell Lee Maze v. State, No. M2008-01837-CCA-R3-PC, 2010 WL 4324377, at *27 (Tenn. Crim. App. Nov. 2, 2010) (holding that even if trial counsel's performance failure to present a medical expert to contradict the State's evidence regarding causation of the victim's injuries was deficient, petitioner had failed to show any resulting prejudice because the defense explored medical issues favorable to its position through cross-examination).

## CONCLUSION

The Petitioner has failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel at trial.  We, therefore, affirm the judgment of the post-conviction court denying relief.

_____
D. KELLY THOMAS, JR., JUDGE